Filed 2/16/22  P. v. Palmer CA2/2
Opinion following transfer from Supreme Court

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B302342 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA356413) |
| v. | |
| KELSIE JAMES PALMER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ronald S. Coen, Judge.  Affirmed in part; reversed in part and remanded.

Waldemar D. Halka, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Shezad H. Thakor and Michael C. Keller, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Kelsie James Palmer (defendant) appealed from the 2019 judgment entered after being convicted of murder, attempted murder, and making a criminal threat.[1] Defendant challenged rulings related to the invocation of the Fifth Amendment right of his two accomplices not to testify, and the trial court's refusal to give a limiting instruction on the issue. He also challenged the court's exclusion of fingerprint evidence, failure to excise the "certainty factor" from CALJIC No. 2.92 regarding eyewitness identification, giving allegedly erroneous aiding and abetting jury instructions, failure to instruct the jury that gang evidence alone cannot prove that a defendant is an aider and abettor, advising the jury of courtroom operation costs, and failure to provide a unanimity instruction relating to the criminal threat charge. Defendant complained of vindictive prosecution, the court's failure to determine his ability to pay before imposing statutory assessments and a fine, and cumulative prejudice from all the claimed errors.

We affirmed the judgment in an unpublished opinion filed May 12, 2021. We then granted defendant's petition for rehearing on the jury instruction "certainty factor" in CALJIC No. 2.92, and in an unpublished opinion filed September 3, 2021, we again affirmed the judgment. The California Supreme Court granted review and by order dated December 1, 2021, transferred

---

[1] This appeal is taken from the judgment in defendant's second trial. In 2011, defendant was convicted of the same charges, and the conviction was affirmed on direct appeal, but a federal writ of habeas corpus resulted in reversal of the conviction and retrial. (See *Palmer v. Davey* (9th Cir. 2018) 729 Fed.Appx. 573.)

2

the matter back to this court with instructions to vacate our decision and reconsider the cause in light of Assembly Bill No. 333 (Assembly Bill 333) (Stats. 2021, ch. 699).  We thus hereby vacate our prior opinion and address the Assembly Bill 333 issue in part XI of our Discussion.  After reviewing the parties' supplemental briefs and upon reconsideration in light Assembly Bill 333, we reverse and vacate the sentence, and remand the matter with directions, but we otherwise affirm the judgment.

## BACKGROUND

In 2019, the jury in defendant's second trial convicted him and two codefendants, Joel Childress and Eric Allen, of first degree murder in violation of Penal Code section 187, subdivision (a).[2]  The jury found true the special circumstance allegation that defendant intentionally killed the victim while he was an active participant in a criminal street gang and the murder was carried out to further the activities of the gang.  (§ 190.2, subd. (a)(22).)  The jury also found defendant guilty of two counts of attempted willful, deliberate, and premeditated murder (§§ 187, subd. (a), 664) and one count of making a criminal threat in violation of section 422.  The jury found true both the allegation that a principal personally and intentionally used and discharged a firearm, within the meaning of section 12022.53, subdivisions (b), (c) and (e)(1), proximately causing great bodily injury and death to the victims, and that the crimes were committed for the benefit of a criminal street gang, with the specific intent to promote,

---

[2]     All further statutory references are to the Penal Code, unless otherwise indicated.

3

further and assist in criminal conduct by gang members, within the meaning of section 186.22, subdivision (b)(1)(C). The jury also found true a firearm enhancement alleged pursuant to section 12022.5, subdivision (a), which was added prior to the second trial.

Defendant was sentenced on November 8, 2019. With count 5, criminal threats, as the base term, the trial court sentenced defendant to a determinate prison term of 11 years, consisting of the middle term of two years plus four years for the firearm enhancement alleged under section 12022.5, subdivision (a), and five years for the gang enhancement alleged under former section 186.22, subdivision (b)(1). The trial court sentenced defendant to a consecutive term of life without the possibility of parole (LWOP) for the special circumstance murder, plus a term of 25 years to life for the firearm enhancement alleged under section 12022.53, subdivisions (d) and (e)(1); and the court imposed and stayed terms for the remaining enhancements. As to each of the two attempted murders, the court imposed a consecutive life term plus 25 years to life for the firearm enhancement alleged under section 12022.53, subdivisions (d) and (e)(1), and imposed but stayed the remaining enhancements. The court further ordered defendant to pay fines, fees, and victim restitution.

**Prosecution evidence**

### *The criminal threat*

Yvonne Love testified that on May 8, 2009, she was walking west in an alley near Degnan and Exposition Boulevards when a blue four-door car turned into the alley, traveling east. The car had tinted windows and when it came close to her a window was rolled down. As she passed the car she heard the

4

front passenger, whom she later identified as defendant, say, "Pull back. Pull Back. Pull back. Pull Back." The car stopped, backed up, and the backseat passenger got out holding a black gun. As he held the gun to her chest, he followed directions from the front passenger, who said, "Get off the car and get her." Love later identified defendant, who was thinner then than at trial, as the front passenger who was "calling the shots." The back passenger who got out with the gun appeared to be younger, a "little boy."

Love asked the men to let her please just go get her bacon and eggs. People, who were starting to move around nearby, seemed to spook the man holding the gun. When defendant told her to approach, she saw a large black revolver in his lap (a "Dirty Ha[r]ry" or "cowboy" gun). Defendant said something about the blue "rag" on her head, and she remembered that she was wearing a borrowed blue bandanna that day. She thought they were all "gang-banging" on her. Defendant said, "Bitch, I'll kill you. Blood. I'll kill you." Irritated, he was "running his mouth" and "was just going crazy on [her]." She took it as a serious threat. Defendant asked if she knew the neighborhood she was in because of the blue rag on her head. She interpreted that to mean that he was a gang member. She was within about four or five inches of him and maintained eye contact, focusing primarily on him because he was calling the shots. The driver then said, "Bullets have no names on them," and drove away.

Love memorized the car's license plate number, and at 10:28 a.m., she called 911 and gave the number to the operator. The police came quickly, and as soon as they arrived, Love heard gunshots. Her neighbor ran up and said that a girl had just been hurt. The 911 call was played for the jury, who heard Love

5

describe the car and say it went toward Exposition Boulevard. She described the back passenger as wearing a black hoodie; the driver, a gray and red sweatshirt; and defendant, a gray shirt.

### *The shooting*

Nineteen-year-old Rosa Gallegos was fatally shot on May 8, 2009, shortly before 10:30 a.m.  She was sitting in her parked car on 11th Street,[3] chatting with her boyfriend of two years, Luis Miralda and his neighbor, Kenneth Thomas.  After giving Gallegos a kiss through the driver's side window, Miralda moved to the passenger side of her car intending to enter.  As he did, a black Chevrolet Malibu stopped in the street just to the rear of Gallegos's car, facing in the same direction.

Miralda and Thomas both testified.  Miralda saw three men in the car: the driver and two passengers, one in the front and one in the back seat.  The back door opened, and a man got out and started shooting.  Miralda thought the front passenger door may also have opened.  When he saw a gun pointing toward him and Thomas, Miralda ducked down by the sidewalk and heard five or six gunshots in rapid succession.  He saw Thomas fall on the sidewalk next to the front of Gallegos's car and then heard more gunshots.  When the shooting stopped, the car traveled toward Jefferson Boulevard.  Miralda got up and saw that Gallegos had been shot in the chest and side.  Her eyes were open, and she was shaking and unable to talk, although she tried.  He called 911, and the recording was later played for the jury.  He described the car as a black Chevrolet Malibu but seemed unable to focus on questions about the suspects.  Miralda knew

---

[3]     Not far from where Love encountered the three men later identified as defendant, Allen and Childress.

6

he saw one person but thought he may have seen two shooters, one in front and one in the back.

Thomas testified that he, Miralda and Gallegos had walked across the street to her Monte Carlo, which Gallegos entered. After a few minutes, he saw a dark-colored sedan approaching with at least three occupants. The car stopped near the side of the Monte Carlo. Thomas saw an arm and a gun flash that appeared to come from the back seat. He heard about four gunshots and was hit in the arm with the first one. Thomas was squatting, holding his wound, and peering through the window when he heard Gallegos call out to Miralda, and then saw the same arm come through her driver's side window and shoot her a couple times. The backseat passenger was the only person he saw out of the car. The bullet that hit his arm went straight through, shattered the bone from his elbow up. Rods and pins were later placed in his arm, which took about a year to heal and still sometimes bothers him 10 years later.

Thomas testified that a few days later he spoke to the police but had difficulty remembering what he told them, even after being given the opportunity to refresh his memory by reading his prior testimony. He remembered that he saw the arm of someone wearing a gray windbreaker-type jacket with a little red on it and that the shooter was male. Thomas acknowledged that the transcript of the prior trial reflected that he testified that there were two shooters, although at this trial, he could remember only one shooter. Finally, the trial court took judicial notice of Thomas's 2011 testimony, as follows:

> "[Q:] 'How many people got out of the vehicle?' [A:] 'I think two.' [¶] . . . [¶] [Q:] 'Do you remember telling either this detective or Detective Gordon that one person got out of the car?' [A:] 'I don't

remember. I remember the door opening. I remember two people getting out. Like, one was busting over the car. One hit me, I guess. I got down, to stay out of the way, and that's how it went.' [¶] . . . [¶] [Q:] 'But did you say'—Again, I'm just trying to get what you are saying. 'Did you tell the officers that two passengers got out, or one passenger got out?' [A:] 'I don't know. I know one got out and started shooting that hit me, but I know there was two shooters.' [¶] . . . [¶] [Q:] 'And you're certain that you [*sic*] both got out of the back seat?' [A:] 'Yeah. And I know what two guns being fired sound like. I know what two doors closing, like, after guns shooting, sound like. I know what they look like, opening, or what they sound like opening.' [¶] . . . [¶] [Q:] 'So you told the detectives that there were two shooters?' [A:] 'I just sat here and told you it was two shooters.' [¶] . . . [¶] [Q:] 'Did anyone come out of the front passenger?' [A:] 'Nah.'"

Thomas recalled that in his 2011 testimony he was asked whether he saw a front passenger and that he replied, "I didn't see. I didn't see what the driver looked like. I didn't see if there was a front seat passenger. I got shot from the backseat."

### *The investigation*

Detective Phil Rodriguez and his partner Officer Kenneth Sanchez arrived at the murder scene soon after the shooting. The area was known to be the territory of the Rolling 30's Harlem Crips gang (Rolling 30's), a mortal enemy of the Black P-Stone (BPS) gang. Suspecting a gang shooting, the officers obtained a description and license plate number of the suspects' car and went in search of it in rival BPS gang territory. The officers spotted the car and followed it to a gas station, where its occupants were detained. After the officers ordered the two

occupants out of the car, they identified Childress and Fila Burton, who lived with Childress. They took possession of two cell phones, one from Childress's person and the other found in the car. Thirty-two fingerprints were lifted from the car belonging to Allen and Childress, but none was identified as belonging to defendant.

Spent cartridge casings from a semiautomatic handgun, some brass and some aluminum, were found in Gallegos's Monte Carlo and on the ground outside, under the car, on the driver's side, and on the rear passenger side. Bullets and fragments were also recovered. After Childress was arrested, his home was searched, and a box of ammunition was found containing five Blazer nine-millimeter Luger brass rounds and four CCI nine-millimeter Luger aluminum rounds.

A firearms expert examined the casings found at the scene of the shooting. A few were CCI aluminum casings, and the rest were brass casings manufactured by PMC, Blazer, and Speer. The expert was able to determine that all of them were fired by the same nine-millimeter semiautomatic handgun and that two of the bullets recovered could have come from that same firearm.

About one week after the shooting, Detective Brian Thayer and his partner Officer Jarrott stopped a car driven by defendant, who was accompanied by two members of the BPS gang. At the time Detective Thayer worked primarily in the Los Angeles Police Department gang unit, specializing in Blood gangs, especially the BPS gang. He had both experience and vast knowledge about its culture, lifestyles, members, rivalries, allies, attire, locations, and the types of crimes they committed. As he approached the stopped car, Detective Thayer recognized the driver as defendant from prior contacts. He also recognized

9

defendant's passengers Richard Bennett and Bryant Garbutt from prior contact with them. It was Detective Thayer's expert opinion that defendant was a member of the BPS gang. Defendant had repeatedly admitted to Detective Thayer that defendant was a member of the BPS gang and that he had gang-related tattoos: a large "B" and "S" meaning "Black Stones" on his chest. On his stomach was "JSB," meaning "Jungle Stone Bloods," both common tattoos for BPS members.

When defendant was arrested, the officers recovered gloves and hoodies, items often used to commit gang-related crimes to hide identity, fingerprints or gunshot residue, in the car. They also recovered an Atlanta Braves hat and a cell phone.

The next day police searched defendant's residence and in a bedroom found a letter addressed to defendant dated March 29, 2008. The last line in the letter read: "Keep shit active. Stone love or no love." Police also found a red Atlanta Braves baseball cap, a red St. Louis Cardinals baseball cap, and a gray and red-hooded sweatshirt.

An examination of defendant's cell phone revealed several BPS gang-related text messages. Cell tower data placed defendant's cell phone number near the scenes of both crimes around the time they occurred. Defendant's phone received two calls between 10:25 and 10:30 a.m. The first call went unanswered, and the second call resulted in a conversation. The first call used a cell tower near the scene of the shooting, and the second call used a tower near the area where Love was threatened.

An examination of the cell phones recovered from Childress and defendant disclosed several contacts with each other between 7:54 a.m. and 9:16 a.m. on May 8, 2009. The last communication

10

occurring approximately one hour before the shooting. Those calls used a cell tower near defendant's home.

### *The identification of the suspects*

Love gave Detectives Richard Gordon and Brian Calicchia descriptions of the driver and passengers. All three were African-American men. The driver was described as light-complected, a "caramel brown," the same as defendant. The backseat passenger had a darker complexion and was heavier than the driver. Officers took Love to a gas station where they asked whether a person there was the one who had pulled the gun on her. She identified the man as the driver. She also identified the car at the gas station as the one he had been driving.

The next day the detectives brought Love a six-photograph photo lineup. She circled photograph Nos. 3 and 6 and wrote that she was certain that No. 6 was the front seat passenger with the gun, although No. 3 had a similar forehead. Defendant's photograph was in the No. 6 position. In another photographic lineup, Love identified Allen's photograph as depicting one of the suspects, and in another she incorrectly identified a photograph as possibly depicting the backseat passenger.

Although at trial Love did not initially remember a live lineup, she did remember that she had been shown three people behind a glass and had identified defendant as the front passenger. She also identified him in court in 2010 and identified him at the second trial as the person in the front seat. On the same day as the live lineup, May 18, 2009, the detectives showed her a gray and red sweater, which she identified as the sweater worn by defendant.

Miralda spoke to the police at the scene after Gallegos left in an ambulance. Although his memory at the second trial had

11

faded, he testified that he said the driver and front passenger were Black males, one of them wore his hair in an afro style about three or four inches long, and the front passenger was in his early 20's, with a short haircut, and had a gray zip-up sweatshirt with a red design. He said the shooter wore dark clothing. The backseat passenger wore a dark hoodie with the hood up and had a dark complexion. Later that day police took him to a gas station to see if he could identify any person or car. He recognized a person from the car and thought the car at the gas station looked like the same black Chevrolet Malibu. Miralda testified that the person looked like the front passenger, but he had trouble remembering. At the time of his identification, he wrote a short statement saying that he was "100 per cent sure" that the person was the driver and the car was the same car.

Miralda met again with detectives a few days later and they showed him several sets of photographs. He circled defendant's photograph noting a similar shaped face as the front passenger, the one in the gray sweatshirt with red design on the right shoulder. Ten days after the shooting Miralda was shown a live lineup. He said that Nos. 1 and 4 looked like the passenger, but he was not 100 percent certain. Defendant was in the No. 5 position. Miralda was also shown a sweatshirt and identified it as the sweatshirt worn by the front passenger. When Miralda testified in 2010, he identified all three defendants in court and identified Allen as the back passenger.

### Gang evidence

Officer Sanchez testified as the prosecution's gang expert regarding the BPS gang, its history, territory, symbols, and its primary criminal activities, including murder, attempted murder, robberies, burglaries, weapons possession, narcotics sales, and

extortion.  He noted that the gang members also engaged in writing BPS-related graffiti in their territory and rival gang territory and in crossing out rival gangs' graffiti.  He opined that this and the commission of violent crimes was used to instill fear and intimidation within the community.  Intimidating and scaring witnesses and victims caused them to be reluctant to testify or cooperate with law enforcement.  The gang also intimidates the community by displaying their gang colors.  As a Blood gang, BPS associated with the color red, while Crip gangs used the color blue.

Officer Sanchez explained "snitching" as cooperating with law enforcement or giving them information about any gang member, whether he is a member of his own gang or a rival gang.  Snitching is also telling others, such as a girlfriend or other loved one, about a gang member's involvement in a crime.  Consequences for snitching range from a beating to being murdered in gang culture.  Snitching on one's fellow gang member is likely to get the snitch murdered.

Officer Sanchez testified that the charged crimes were committed in the territory occupied by the 18th Street and the Rolling 30's gangs, which were rivals to the BPS gang.  Like Detective Thayer, Officer Sanchez was of the opinion that defendant, Childress, and Allen were all members of the BPS gang.  All three had tattoos that showed their affiliation with the BPS gang.  Furthermore, both defendant and Allen had previously admitted to their membership in the BPS gang.

Officer Sanchez was asked two hypothetical questions based upon the facts in evidence in this case.  In the first, he was asked to assume that three BPS gang members drove into rival gang territory and threaten a woman wearing a blue bandanna.

13

In the second hypothetical, Officer Sanchez was asked to assume that three members of BPS drive into rival gang territory and, seeing a young Latino man, immediately stop the car, and two of the gang members begin shooting him and the two people near him. It was Officer Sanchez's opinion that in both hypotheticals, the crimes were committed in association with the BPS gang for the gang's benefit and to elevate the participants' status within the gang by strengthening the power and reputation of the gang through fear. Officer Sanchez also opined that all three hypothetical participants in the crime were active members of the gang.

**Defense evidence[4]**

Professor of cognitive science and experimental psychologist Kathy Pezdek, Ph.D., testified as an eyewitness identification expert. She explained how human memory works and the various factors that affect eyewitness identification, such as exposure time (the length of time one looks at the perpetrator's face), distractions, obstructions, the stress of the event, a disguise or anything that might cover the perpetrator's face, same-race identification, time delay, a biased identification test, postevent contamination, and the inherent bias of in-court identification.

**Refusal of Allen and Childress to testify**

Out of the presence of the jury, the trial court and counsel discussed the transcript of the police interviews of Allen and Childress, and defense counsel asked the court if Allen could be brought out and questioned before calling him in front of the jury. The court replied, "No. No. If he refuses to testify, he can refuse to testify in front of the jury. He has no 5th Amendment, or no

---

[4]     Defendant did not testify.

14

6th Amendment issue." Defense counsel asked for a ruling on the pretrial issue regarding whether the court would allow the prosecution to have the jury see the witnesses refuse to testify. Defense counsel wanted to "renew [his] objection" to that procedure, as well as his objection based on the ruling that the witnesses had no privilege against self-incrimination. He also asked that counsel be appointed for the witnesses in "an abundance of caution" concerning the possibility that the privilege may be available to them. The court overruled the objections and denied the request.

Later, outside the jury's presence, the court reported that as expected, Allen refused to leave lockup. The court added, "I can extract him, have him dragged out, and he will refuse to testify. I am not inclined to do that." Defense counsel agreed and stated he would object if Allen were brought out in front of the jury. Without objection, the court stated: "The witness, Eric Allen, has refused to come to court from the lock-up. I could drag him out here, which I am not going to do. No person has a right to refuse to testify. Mr. Allen does not have a right to refuse to testify, but to go through a circus and a charade such as this, I am not going to do this. [H]e has refused to testify. He does not have the right to refuse to testify, and so we'll go forward."

When the prosecutor called Childress to testify, he appeared and was sworn. The prosecutor's first and only question was, "[D]id you ever tell the Los Angeles Police Department anything about what happened on May 8th, of 2009?" There was no objection, and Childress replied, "I invoke the 5th Amendment." Told by the court that he did not have the Fifth Amendment privilege and that he had to answer the question, Childress asked why. The court stated, "One, because I

15

ordered you to," to which Childress replied, "You already ordered me to 122 years, life without." After the court asked Childress whether he was refusing to answer the question, Childress asked, "[H]ow come I don't talk to no counsel or nothing?" The court explained that he had no Fifth Amendment privilege and asked whether he intended to answer any questions. When Childress replied, "No," the court stated, "Sir, you are in contempt of court. Remove the witness, please."

The next day, defense counsel asked the court to instruct the jury not to draw any inferences from the refusals of Allen and Childress to testify. Defense counsel also moved for a mistrial based on Childress's "demonstration before the jury." After hearing argument, the trial court denied both motions.

## DISCUSSION

### I.     Childress and Allen and their refusal to testify
#### A.     *Generally*

Defendant contends that the trial court's ruling that Allen and Childress did not have the right to refuse to testify, based on the privilege against self-incrimination, was made without a hearing in violation of California law and Fifth Amendment procedural rules. Defendant also claims that the trial court prejudicially erred in failing to appoint counsel for Allen and Childress.

"To avoid the potentially prejudicial impact of having a witness assert the privilege against self-incrimination before the jury, [it is] recommended that, in determining the propriety of the witness's invocation of the privilege, the trial court hold a pretestimonial hearing outside the jury's presence." (*People v. Mincey* (1992) 2 Cal.4th 408, 441.) When there is a dispute about

16

whether a witness may legitimately rely on the privilege, "[s]uch a procedure makes sense under the appropriate circumstances." (*People v. Doolin* (2009) 45 Cal.4th 390, 442.) "[I]t is the better practice for the court to require the exercise of the privilege out of the presence of the jury [citation]." (*People v. Johnson* (1974) 39 Cal.App.3d 749, 759.) However, whether to do so is a decision within the trial court's discretion. (*People v. Pugh* (1983) 145 Cal.App.3d 854, 859.)

Defendant acknowledges the general rule that the privilege against self-incrimination terminates "when the sentence has been fixed and the judgment of conviction has become final," as stated by the United States Supreme Court in *Mitchell v. United States* (1999) 526 U.S. 314, 326. Citing inter alia, *People v. Sisneros* (2009) 174 Cal.App.4th 142, 149-154 (*Sisneros*), *People v. Lopez* (1999) 71 Cal.App.4th 1550, 1554 (*Lopez*) and *People v. Fonseca* (1995) 36 Cal.App.4th 631, 635, defendant also acknowledges that California appellate courts have long permitted trial courts to allow witnesses who lack the privilege against self-incrimination to be called to the stand to invoke the privilege and refuse to testify in the presence of the jury. Defendant further acknowledges that when witnesses have no constitutional or statutory right to refuse to testify, jurors are entitled to draw a negative inference from their refusals. (See, e.g., *Sisneros, supra*, at p. 152; *Lopez, supra*, at pp. 1554-1556.)

Defendant's complaint appears to be that the trial court should have appointed counsel for Allen and Childress and then held a hearing outside the jury's presence to determine whether there was another valid ground to assert a Fifth Amendment privilege not to testify about the crimes they committed with defendant. The argument is that the trial court erred in finding

17

that any privilege against self-incrimination they had, terminated on the finality of their convictions. However, defendant has not identified an error that violated a federal constitutional right held *by him*. He complains that the trial court's procedure denied *Allen* and *Childress* of fundamental fairness under the federal and state Constitutions. Defendant has no standing to object to violation of another person's Fifth Amendment privilege against self-incrimination. (*People v. Badgett* (1995) 10 Cal.4th 330, 343.)

Defendant claims that in *McKune v. Lile* (2002) 536 U.S. 24 (*McKune*) the United States Supreme Court created an exception to the general rule that the privilege terminates as to an offense upon the finality of the conviction. His claim is based on dicta found in the plurality opinion such as, "The privilege against self-incrimination does not terminate at the jailhouse door . . . ." (*Id.* at p. 36.) The remainder of the sentence, which defendant did not quote, was, "but the fact of a valid conviction and the ensuing restrictions on liberty are essential to the Fifth Amendment analysis." (*Ibid.*) There, a prison rehabilitation program required participants to admit their criminal conduct and accept counseling or lose certain privileges. The Supreme Court rejected the inmate's Fifth Amendment claim and found that the loss of privileges did not amount to unconstitutional coercion. (*McKune, supra*, at pp. 40-45, 47-49.) This case is not applicable to the facts presented here.

Defendant also relies on what he calls the "*In re Duckett* caveat," which he has read into *In re Duckett* (1978) 76 Cal.App.3d 692 (*Duckett*). There, after Duckett had been found not guilty of a crime by reason of insanity and sent to a hospital, a hearing was held to determine whether he was no longer a

18

danger and entitled to be released.  (*Id*. at p. 694.)  Duckett invoked the Fifth Amendment and refused to testify, and the refusal was considered in denying his request for outpatient parole.  (*Id*. at pp. 697-699.)  In denying his petition for writ of habeas corpus, the appellate court explained that Duckett had "no Fifth Amendment right to refuse to take the witness stand," because he could never again be prosecuted for the crimes that resulted in his hospital commitment.  (*Id*. at p. 699.)  The court then added the language that defendant refers to as a "caveat": "[I]f perchance while on the witness stand [Duckett] were to be asked questions having a reasonable tendency to so incriminate himself, his right to then decline to answer was in no way abridged."  (*Ibid*.)

Neither *McKune* nor *Duckett* involved the issue of calling a witness to the stand in the presence of a jury with knowledge that the witness will likely invoke the Fifth Amendment.  As the People argue, the language in *Duckett* quoted by defendant, like the holdings in *Sisneros* and *Lopez*, stands for the proposition that a person may not rely on the privilege to refuse to take the witness stand or refuse to testify about a crime for which he has already been subjected to a final judgment after a conviction or an acquittal; and taking the witness stand cannot be avoided simply by speculating that some question could be asked that would tend to incriminate him.  (See *Sisneros, supra*, 174 Cal.App.4th at pp. 149-154; *Lopez, supra*, 71 Cal.App.4th at p. 1554; *Duckett, supra*, 76 Cal.App.3d at pp. 698-699.)

Defendant responds that Allen and Childress *might* give the testimony that would lead to evidence of some different crime.  He cites the test set forth in *Hoffman v. United States* (1951) 341 U.S. 479, 486-488 (*Hoffman*), as quoted in *People v.*

19

*Trujeque* (2015) 61 Cal.4th 227, 267-268 (*Trujeque*), as follows: "The test from *Hoffman* provides that '[t]o sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result.' [Citation.] In that regard, a witness's answers need not in themselves support a conviction under a criminal statute, but may 'furnish a link in the chain of evidence' needed to prosecute the witness for a crime. [Citation.] Ultimately, a trial court may reject an assertion of the privilege only when it appears to the court "'*perfectly clear*, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] *cannot possibly* have such tendency" to incriminate.'"

Defendant concludes from the quoted language that the trial court erred in "predetermin[ing]" that the privilege did not exist without the appointment of counsel for Allen and Childress and a pretestimonial hearing outside the jury's presence with careful consideration of all the circumstances. Defendant has not, however, shown that the trial court failed to consider all the relevant circumstances. As the People point out, *Trujeque* also held that a witness may not "make a blanket assertion of the privilege against self-incrimination." (*Trujeque, supra*, 61 Cal.4th at p. 267; see *Hoffman, supra*, 341 U.S. at p. 486.) The privilege relates to specific areas of testimony; thus, "'[a]lthough the witness may have a valid claim to the privilege with respect to some questions, the scope of that privilege may not extend to all relevant questions.'" (*Trujeque, supra*, at p. 268.) And as the People note, defendant has pointed to nothing in the record

20

indicating that the prosecutor intended to elicit testimony about any matter other than the crimes Allen and Childress committed on May 8, 2009, for which they were convicted. Indeed, the only question put to Childress before he refused to answer was, "[D]id you ever tell the Los Angeles Police Department anything about what happened on May 8th, of 2009?"

Moreover, the trial court held a pretrial hearing under Evidence Code section 402 to determine whether the prosecution could call the witnesses in front of the jury and whether they could assert the privilege against self-incrimination.[5]

As the trial court's orders are presumed correct, it is defendant's burden not only to present a record adequate for review, but also to affirmatively demonstrate error. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564-565.) Defendant agrees that the witnesses' convictions for the crimes charged here against defendant were final. Thus, the trial court correctly ruled that their privilege against self-incrimination had terminated with regard to relevant questions about the crime that resulted in those convictions. (*Sisneros, supra*, 174 Cal.App.4th at pp. 149-151; *Lopez, supra*, 71 Cal.App.4th at pp. 1555-1556.)

We agree with the People that any error in allowing the jury to know that the two witnesses refused to testify and in declining to appoint counsel for them is harmless and should be reviewed under the test for prejudice due to state law error as

---

[5] We observe that that the Honorable Ronald S. Coen presided over the 2010-2011 trial of defendant, Childress, and Allen, as well as defendant's retrial, the subject of this appeal. We assume he was familiar with the facts about which the prosecutors would question the two witnesses.

stated in *People v. Watson* (1956) 46 Cal.2d 818, 836, which asks whether it is reasonably probable the defendant would have obtained a different result absent the asserted error. Defendant disagrees and contends that the proper test for federal constitutional error is found in *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*), which requires that the People show beyond a reasonable doubt that the asserted error did not contribute to the verdict.

Defendant claims that the asserted errors fail both tests for prejudice, as the evidence against him was not compelling or overwhelming, and the asserted error filled in all the holes in the prosecution's case. Defendant also contends that prejudice is shown by the court's denial of his request to instruct the jury not to infer anything from the witnesses' refusals, and then, without a limiting or curative instruction, instructing them with CALJIC No. 2.00 that "[e]vidence consists of the testimony of witnesses, writings, material objects, or anything presented to the senses and offered to prove the existence or non-existence of a fact." He reasons that telling the jury that Allen refused to testify when he had no right to do so, allowing Childress to claim the privilege before the jury, and allowing him to say that he was sentenced to 122 years and "life without" amounted to evidence the jury was allowed use in any manner they chose, even to establish defendant's guilt. Defendant concludes: "There can be no greater prejudice to the accused than to have two accomplices under the prosecution's direct perpetrator-accomplice theory tell the jury that the defendant was guilty based on their refusal to testify and the court's finding that they had no right to refuse to testify because the privilege against self-incrimination did not apply to them."

22

Neither the witnesses nor the court told or suggested any such thing to the jury. As the People point out, defendant "fails to identify even a single instance during the closing arguments in which the prosecution even mentioned the refusals, much less encouraged the jury to use the refusals for an improper purpose." We agree.

Defendant has failed to show that the trial court erred in refusing his request for an instruction that *no* inference could be drawn from the witnesses' refusals to testify. In rejecting defendant's request for such a sweeping instruction, the trial court held that the jury was entitled to consider the refusals to support the evidence that gang members act as a unit to advance the cause of the gang and to protect their members. The court did not err. The refusals were admissible to support the gang expert's testimony regarding BPS gang's primary criminal activities of witness intimidation as a means of making witnesses reluctant to testify and that snitching on one's fellow gang member has serious consequences. (See *Sisneros, supra,* 174 Cal.App.4th at p. 152.)

Defendant could have requested an *appropriate* instruction limiting the jury's consideration to such purpose. (See *Sisneros, supra,* 174 Cal.App.4th at pp. 152-153.) But he did not and now complains that the absence of a limiting instruction caused him to be prejudiced by the witnesses' refusals. "[A]lthough a court should give a limiting instruction on request, it has no sua sponte duty to give one." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1051.) However, one of defense counsel's express bases for his objection was his concern that the jury would infer that the witnesses were unwilling to testify because they could be labeled a snitch and killed for it, a *permissible* inference. (See *Sisneros,*

23

*supra*, at p. 152.)  Defendant may not now complain that he was prejudiced by the omission of an inappropriate limiting instruction.  (See *People v. Wader* (1993) 5 Cal.4th 610, 657-658.)

We also agree with the People that the evidence of defendant's guilt was compelling and overwhelming.  Defendant's claim to the contrary is based on conflicts in the witnesses' identifications, specifically: Love's difficulty identifying defendant in a photographic lineup, and her uncertainty until she saw him in a live lineup; witnesses' inability to describe defendant's clothing with certainty or in minute detail; Miralda's criminal convictions; because cell phones do not necessarily connect to the nearest tower; and because defendant's fingerprints were not found in the car.

Defendant's argument ignores the compelling evidence that Love identified defendant in a photographic lineup one day after the shooting and 10 days later in a live lineup.  She identified him both in court in 2010 and in this second trial.  Love identified the gray and red sweater as having been worn by defendant during the crime.  Miralda identified defendant's photograph in a photographic lineup a few days after the shooting.  Miralda testified that in 2010, he identified all three defendants in court and identified Allen as the back passenger.  These identifications were corroborated by evidence that after speaking with Childress a few times by cell phone earlier that morning, defendant was in the vicinity of the charged crimes when they occurred, notwithstanding which tower the calls went through.

Defendant concludes that "[t]he jury could have also reasonably concluded that Allen had also been convicted and sentenced because his refusal to testify, like Childress' refusal, was based on his guilt."  If we correctly understand defendant's

24

conclusion, we disagree. The trial court instructed the jury: "There has been evidence in this case indicating that a person other than the defendant was or may have been involved in the crime for which the defendant is on trial. There may be many reasons why that person is not here on trial; therefore, do not speculate or guess as to why the other person is not being prosecuted in this trial, or whether he has been or will be prosecuted. It is your sole duty to decide whether the People have proved the guilt of the defendant on trial." "'It is fundamental that jurors are presumed to be intelligent and capable of understanding and applying the court's instructions.'" (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 433.)

Thus, we are satisfied that defendant was not prejudiced under any standard by the absence of a formal hearing and the appointment of counsel for Childress and Allen.

**B.** *Childress's refusal to testify*

Defendant contends: "The trial court erroneously and prejudicially tainted [defendant]'s jury trial by finding that Eric Allen and Joel Childress did not have the right to refuse to testify because their privilege against self-incrimination had terminated and the jury could draw adverse inferences against [defendant] based on their refusal to testify." (Boldface and capitalization omitted.) Though, defendant acknowledges that the Fifth Amendment privilege terminates as to crimes that have resulted in final convictions, he argues the trial court should have determined whether there were other crimes not related to the crimes charged against defendant, as long as the statute of limitations has not run on unrelated crimes, Allen and Childress could be prosecuted for gang-related crimes committed before 2009 or after they were sentenced to prison.

25

As we discussed at length in part I above, the Fifth Amendment privilege is topic-specific.  (*Trujeque, supra*, 61 Cal.4th at p. 268.)  The trial court conducted an Evidence Code section 402 hearing on the issue prior to trial and defendant renewed his objections on that issue before either of the two witnesses were called.  There was no indication in the record that the prosecution intended to ask Allen or Childress about any criminal activity unrelated to the four crimes committed on May 8, 2009, for which their convictions are final.  Defendant speculates that the jury would infer defendant's guilt from the witnesses' refusals to testify.  Defendant could have requested a limiting instruction (see *People v. Hernandez, supra*, 33 Cal.4th at pp. 1051-1052), which would have cured any potential prejudice.  (See *People v. Homick* (2012) 55 Cal.4th 816, 866-867.)

Finally, we have rejected defendant's claim of prejudice.  We need not revisit the issue.

Defendant contends that the trial court should have given an instruction not to draw any inferences from Childress's invocation of the Fifth Amendment, as it violates Evidence Code section 913, which prohibits comments on the exercise of a privilege not to testify and requires the court to instruct the jury not to draw inferences from the exercise.  However, section 913 presupposes a valid exercise of a privilege.  (See *Lopez, supra*, 71 Cal.App.4th at p. 1554.)  Thus, when a witness has no constitutional or statutory right to refuse to testify, jurors are entitled to draw a negative inference from their refusals.  (See,

e.g., *Sisneros, supra*, 174 Cal.App.4th at p. 152; *Lopez, supra*, at pp. 1554-1556.)[6]

Defendant argues that the trial court's statement that Childress had no right to refuse to testify and his unsolicited comment that the court had already given him 122 years, "life without," was inadmissible evidence, pursuant to Evidence Code section 352. Defendant supports this contention with a lengthy discussion of Pennsylvania caselaw regarding witnesses' claiming the privilege against self-incrimination.[7] Defendant also contends that the comments of the trial court and Childress were irrelevant and thus inadmissible under Evidence Code section 210 and that the probative value of the comments were outweighed by the danger of undue prejudice, thus excludable in the court's discretion under Evidence Code section 352. Defendant failed to object to the trial court's or Childress's comments; nor did he move to strike Childress's comments. In

---

[6] Defendant contends that the trial court could not properly hold Childress in contempt because "Childress was merely seeking an explanation for the court's conclusions . . . ." Childress refused to answer the first question by invoking the privilege. After the court told him he did not have the privilege, he refused to answer *any* questions. "'A witness may not employ the privilege to avoid giving testimony that he simply would prefer not to give.'" (*Lopez, supra*, 71 Cal.App.4th at p. 1556, quoting *Roberts v. United States* (1980) 445 U.S. 552, 560, fn. 7.)

[7] As defendant does not claim that there is no relevant California judicial authority interpreting Evidence Code section 352, and as he has not explained just how the cited Pennsylvania cases are relevant or necessary to the construction of section 352, we decline to include them in our discussion. (Cf. *Webster v. State Bd. of Control* (1987) 197 Cal.App.3d 29, 37, fn. 3.)

reply to the People's assertion of forfeiture, defendant claims that this issue was preserved by the objection to having the jury see the witnesses refuse to testify, the request for appointment of counsel for the witnesses, and his claim that the procedure violated his confrontation right.

We disagree. A challenge to the admissibility of evidence is generally not cognizable on appeal in the absence of a *specific and timely* objection *or motion to strike* the evidence in the trial court on the ground urged on appeal. (Evid. Code, § 353.) An objection on one ground does not preserve a challenge based upon a different ground. (*People v. Partida* (2005) 37 Cal.4th 428, 434-435.) "[A] 'contrary rule would deprive the People of the opportunity to cure the defect at trial and would "permit the defendant to gamble on an acquittal at his trial secure in the knowledge that a conviction would be reversed on appeal."'" (*Id.* at p. 434.) Thus, "the objection [must] fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling. . . . A party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct." (*Id.* at p. 435.)

Defendant appears to suggest that because Childress blurted out his sentence, defendant had no opportunity to object and that any objection would not have undone the damage. We disagree. A motion to strike the comment and advisement to the jury to disregard it would have undone any damage. Defendant failed to request that relief.

Defendant also contends that the issue was preserved, reasoning that if the court had granted his request for a

28

pretestimonial hearing outside the jury's presence, Childress would not have been in front of the jury.  Defendant cites no authority for this unusual argument.  Defendant further contends that the issue is preserved because he has "standing" to assert the error.  Defendant gives five reasons for claiming that he has standing, but cites authority for just two of them.  Neither defendant nor his two cited cases explain how having standing to assert a claimed error on appeal preserves an otherwise forfeited issue.[8]  We need not discuss contentions that are not supported by legal analysis.  (See *People v. Medrano* (2008) 161 Cal.App.4th 1514, 1520, and cases cited therein.)

Citing *People v. Partida, supra*, 37 Cal.4th at pages 433-439, defendant suggests that all constitutional errors are reviewable without an objection in the trial court.  Defendant is incorrect.  The California Supreme Court held that constitutional claims must be raised in the trial court to preserve a constitutional challenge on appeal; thus a defendant "may not argue on appeal that due process required exclusion of the evidence for reasons other than those articulated in his Evidence Code section 352 argument."  (*Id.* at p. 435.)  Defendant did not make an Evidence Code section 352 objection in the trial court,

---

[8]     Defendant cites section 1259, which does not relieve an appellant of the duty to preserve a claim of evidentiary error with an objection, but rather allows an unpreserved challenge to the giving or omission of a jury instruction if the appellant's substantial rights were affected thereby.  He also cites Evidence Code section 913, which prohibits comments on the exercise of a privilege not to testify and which we have discussed above.  Defendant has not explained how these two provisions excuse a timely objection and motion to strike evidence that is irrelevant or unduly prejudicial.

nor did he raise a relevance objection under Evidence Code section 210. He has thus forfeited his claimed evidentiary errors and any constitutional error that might be based thereon.

Finally, defendant claims that he did not forfeit the issue because it was judicial misconduct to allow the jury to learn irrelevant information and not to give Allen the opportunity to testify after the trial court made its ruling. Defendant fails to provide authority or analysis for this contention. Moreover, defense counsel agreed to the court's procedure, even stating that he would object if Allen were brought in to refuse to testify in front of the jury. Defendant may not now complain. (See *People v. Reynolds* (2010) 181 Cal.App.4th 1402, 1408, citing *People v. Williams* (2008) 43 Cal.4th 584, 629.)

### C. *Allen's refusal to come to court*

Defendant argues: "The trial court violated California law and committed judicial misconduct in [*sic*] when it invited the jury to consider and speculate about accomplice-witness Eric Allen's so-called out-of-courtroom-refusal-to-testify conduct." (Boldface and capitalization omitted.)

Defendant makes no references to the record in which the court invited the jury to consider and speculate about Allen's refusal to testify. Instead, defendant alleges judicial misconduct from the court's disclosure to the jury that Allen refused to come to court and that compelling his attendance would be "a circus and a charade."

As we discussed above, defense counsel agreed with the court that Allen should not be compelled to come into the courtroom. When the court put Allen's action on the record, defendant did not object. Defendant has failed to provide any apt authority or reasoned argument suggesting how a single, brief,

30

agreed-upon procedure and the disclosure of Allen's refusal, amounts to judicial misconduct. We thus decline to address defendant's claim of judicial misconduct. (See *People v. Stanley* (1995) 10 Cal.4th 764, 793.)

Defendant also failed to object to the characterization of a "circus and a charade." "Ordinarily, the lack of an objection at trial forfeits the claim on appeal. [Citation.] However, a failure to object to judicial misconduct does not preclude appellate review when an objection could not have cured the prejudice or would have been futile." (*People v. Houston* (2012) 54 Cal.4th 1186, 1220.) Defendant claims that any objection would be futile in light of the court's previous rulings regarding the privilege and that admonishment would not have cured the prejudice. Defendant's claims do not justify excusing his forfeiture, as he has failed to show that the alleged misconduct displayed any hostility toward defendant or his counsel. We note the purported misconduct was a single remark in a four-day trial, not numerous or extensive remarks. (*Ibid.*) Defendant's contention thus fails on the merits. (See *ibid.*)

Defendant invokes section 1259, arguing that the comments amounted to a jury instruction that no person has the right to refuse to testify,[9] despite the fact that the court was correct that no person may enter a *blanket* refusal to testify. (*Trujeque, supra*, 61 Cal.4th at pp. 267-268; see *Hoffman, supra*, 341 U.S. at p. 486.) If defendant wished clarification, he should have requested it. "A trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel [citation], and failure to request clarification of an

---

[9]     See footnote 8, *ante.*

31

otherwise correct instruction forfeits the claim of error for purposes of appeal [citations]." (*People v. Lee* (2011) 51 Cal.4th 620, 638.) We reject defendant's wholly unsupported claim that the failure to make a modification for which the court has no sua sponte duty amounts to judicial misconduct.

Defendant argues an admonishment would have been ineffective, and the only remedy would have been to compel Allen to come into court and refuse to testify in front of the jury. In a logic-defying argument, defendant posits that this would only have reinforced the "circus and charade" comment, causing defendant even more prejudice.

Finally, defendant asks that we exercise our discretion to consider the issue. We decline to do so as we discern neither merit to the claim or prejudice to defendant. The trial court gave an admonition designed to dispel any prejudice, without forcing Allen into court, by reading CALJIC No. 17.30:

> "I have not intended by anything I have said or done, or by any questions that I may have asked, or by any ruling I may have made, to intimate or suggest what you should find to be the facts, or that I believe or disbelieve any witness. [¶] If anything I have done or said has seemed to so indicate, you will disregard it and form your own conclusion."

Jurors are presumed to have understood and followed the trial court's instructions. (*People v. Gonzales* (2011) 51 Cal.4th 894, 940.) We thus presume that even if the court's comment had amounted to judicial misconduct, it was rendered harmless by CALJIC No. 17.30. (See *People v. Harbolt* (1988) 206 Cal.App.3d 140, 158.)

## II.    Right of confrontation

Defendant contends that the trial court denied his constitutional rights to confront and cross-examine Allen and Childress.  As the prosecutor asked one question of Childress, eliciting no answer, there was no confrontation clause violation. (See *Sisneros, supra*, 174 Cal.App.4th at pp. 150, 154; *People v. Perez* (2016) 243 Cal.App.4th 863, 888.)

Defendant relies in part on *Douglas v. Alabama* (1965) 380 U.S. 415, which bears no similarity to this case.  There, an accomplice was called and invoked his Fifth Amendment privilege (which had not terminated as his conviction was not final) and refused to answer any question regarding the alleged crime.  (*Douglas, supra*, at p. 417.)  The prosecutor then questioned the witness about a confession he had signed and, after each refusal to answer, continued to question him until the entire document had been read.  (*Id.* at pp. 417-418.)  Since the witness refused to answer any questions, the defendant was unable to cross-examine the witness, and his right to confrontation was violated.  (*Id.* at p. 419.)

Defendant also claims error under *Bruton v. United States* (1968) 391 U.S. 123, by quoting part of a passage in that opinion at page 126 regarding "the substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining petitioner's guilt, admission of [the accomplice's confession] violated petitioner's right of cross-examination secured by the Confrontation Clause of the Sixth Amendment."  That case is also inapposite as defendant has pointed to no extrajudicial confession by Allen or Childress presented to the jury in this case.

33

Defendant also relies on *Namet v. United States* (1963) 373 U.S. 179.  Referring to pages 185 and 186 of that opinion, defendant makes the remarkable assertion (in defendant's words) that the United States Supreme Court "concluded that an inference that 'when a witness is asked whether he participated in criminal activity with the defendant, a refusal to answer based on the privilege against self-incrimination tends to imply to the jury that a truthful answer would be in the affirmative' and this 'cannot properly be used as evidence against a criminal defendant.'"  Defendant has chosen isolated phrases from the opinion and then twisted them to result in what he mischaracterizes as the court's holding.  In truth, the phrase was taken from the petitioner Namet's *contention* that such an inference "cannot properly be used as evidence against a criminal defendant." (*Id*. at pp. 185-186.)  Moreover, no confrontation issue was ever presented.  The Supreme Court noted:  "No constitutional issues of any kind are presented[,] [and] [a]ll that this case involves, in short, is a claim of evidentiary trial error." (*Id*. at p. 185.)[10]

Similarly, defendant's confrontation contention devolves into yet another assertion of evidentiary and instructional errors regarding inferences that defendant claims would be erroneously drawn by the jury.  As we have already rejected such claims as forfeited, unsupported, or harmless, we decline to revisit them under the guise of a nonexistent confrontation challenge.

---

[10]    The trial court instructed the jury that it could not draw any inference from the witness's refusal to testify, except "'a logical inference that would appeal to you as having a direct bearing upon the defendant's guilt.'" (*Namet v. United States, supra*, 373 U.S. at p. 185.)

## III. Alleged unfair trial

As a separate argument, defendant contends that the facts and circumstances of the trial court's rulings, including the jury being allowed to draw any and all "adverse inferences" against defendant based on accomplice-witnesses Allen's and Childress's refusal to testify, deprived defendant of due process and a fair trial, requiring reversal of defendant's conviction.

State law error in admitting evidence does not violate due process unless the error renders defendant's trial fundamentally unfair. (*People v. Partida, supra*, 37 Cal.4th at p. 439.) As we have rejected defendant's previously discussed arguments upon finding no error and no prejudice, we reject this contention as well.

## IV. Exclusion of third party culpability evidence

Defendant contends the trial court erred by excluding evidence of latent fingerprints from three people recovered from the Chevrolet Malibu driven by Childress during the crimes. He also contends that the ruling violated his constitutional right to present a complete defense. Defendant claims that the trial court erred in treating the issue as one of third party culpability. Instead, he claims it was a challenge to the inadequate police investigation.

Third party culpability evidence is evidence that would tend to directly connect a third party to the commission of the charged crime. (*People v. Hall* (1986) 41 Cal.3d 826, 832.) At the outset of the hearing defendant's attorney stated: ". . . I believe it's relevant . . . because my defense to the jury is that if P Stone gang members committed this crime, it was *other members* of this gang." (Italics added.) Thus, defense counsel's express reason for the admission of evidence regarding three others was to suggest

third party culpability, rather than to challenge the police investigation.  We therefore reject this claim of error.

Moreover, the trial court acted within its discretion finding the offer of proof insufficient to allow the evidence.  The exclusion of third party culpability evidence is reviewed for abuse of discretion.  (*People v. Elliott* (2012) 53 Cal.4th 535, 581.)  "'To be admissible, the third-party evidence need not show "substantial proof of a probability" that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt.  At the same time, we do not require that any evidence, however remote, must be admitted to show a third party's possible culpability.'  [Citation.]  For example, 'evidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt . . . .'  [Citation.]  Moreover, admissible evidence of this nature points to the culpability of a *specific* third party, not the possibility that some unidentified third party could have committed the crime.  [Citations.]  For the evidence to be relevant and admissible, 'there must be *direct or circumstantial evidence linking the third person to the actual perpetration of the crime.*'"  (*People v. Turner* (2020) 10 Cal.5th 786, 816-817, quoting *People v. Hall, supra*, 41 Cal.3d at p. 833.)

Given that defendant has misstated the relevant facts and argument presented at the hearing of this issue, we summarize: Defendant sought to present evidence regarding three people other than Childress and Allen, whose fingerprints were found in the Chevrolet Malibu, including a photograph of Justin Smith.  Defense counsel represented that all three were members of the BPS gang; that the person in the photograph resembled defendant; and like defendant, he had a light complexion.

Counsel argued that detectives should have exercised diligence to find photographs of the "other two gang members," and include all three of them in a photographic lineup.  However, of the three people, only Smith was a documented member of the BPS gang.  The prosecutor thus questioned the basis of defense counsel's information, noting that the third party fingerprints could have been left at any time, and that Childress and Allen had both given pretrial interviews identifying defendant as the front passenger at the time of the shooting.

The trial court excluded the evidence.  The court explained first that it had reviewed the proffered photograph and found no similarity between defendant and the person depicted there and could not tell if the person's skin tone was light or dark.[11]  The court also found that the offer of proof provided only motive and opportunity, with no direct or circumstantial evidence linking any third person to the actual perpetration of the crime, which is insufficient to raise a reasonable doubt.  (See *People v. Turner, supra*, 10 Cal.5th at p. 817.)

We review a trial court ruling on the admissibility of evidence for an abuse of discretion and will not disturb the court's discretion unless defendant meets his burden to show that the court exercised it in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266.)  Defendant

---

[11]    The trial court marked the photograph as court's exhibit No. 1.  It is defendant's burden to provide an adequate record and to demonstrate error from the record.  (*Denham v. Superior Court, supra*, 2 Cal.3d at pp. 564-565.)  As defendant did not have exhibits transmitted to this court to demonstrate error, we assume the court's impression was correct.

makes no attempt to show that the trial court acted arbitrarily, capriciously, or in a patently absurd manner. He merely repeats his unfounded claim that the three people whose fingerprints were found in the car were members of the BPS gang, which, he argues, provide a gang motive to commit the crime. He also argues that although motive *or* opportunity is insufficient under *People v. Hall, supra*, 41 Cal.3d 826 and its progeny, evidence of both motive *and* opportunity is sufficient to make the evidence admissible. That is not the holding in *Hall*, and defendant fails to provide any authority for his argument. In addition, defendant has failed to show that all three of these people had a gang motive, as just one of them was a documented gang member. Although defendant knew the identities of the three, he did not offer to prove their gang membership. Finally, the defense's offer of proof included no facts regarding opportunity, in that it did not include *when* the fingerprints came to be in the car.

Defendant's offer did not refer to any "'*direct or circumstantial evidence linking the third person to the actual perpetration of the crime.*'" (*People v. Turner, supra*, 10 Cal.5th at p. 817, quoting *People v. Hall, supra*, 41 Cal.3d at p. 833.) Defendant merely repeats the disingenuous argument that the evidence was offered, not as third party culpability evidence, but as evidence challenging the adequacy of the police investigation and showing that the police settled on defendant as the suspect without checking other known leads. Even assuming this had been the true purpose of the evidence and the trial court erred in rejecting it, defendant has failed to demonstrate a miscarriage of justice. A miscarriage of justice occurs when it appears that a result more favorable to the appealing party would have been reached in the absence of the alleged error. (*People v. Watson,*

*supra*, 46 Cal.2d at p. 836; see Cal. Const., art. VI, § 13.) Defendant fails to suggest just how his claim could produce a more favorable result. Defendant has not established an abuse of discretion or a miscarriage of justice.

## V. Jury Instructions

### A. *CALJIC No. 2.92—the certainty factor*

Defendant's sole defense was mistaken identity. He contends that the trial court erred when the jurors were instructed with CALJIC No. 2.92, which suggests a dozen factors to consider in determining the weight to give eyewitness identification testimony, without excising the certainty factor: "The extent to which the witness is either certain or uncertain of the identification."[12] Defendant also contends that the alleged

---

[12] The trial court read CALJIC No. 2.92 as follows:

> "Eyewitness testimony has been received in this trial for the purpose of identifying the defendant as the perpetrator of the crimes charged. In determining the weight to be given eyewitness identification testimony, you should consider the believability of the eyewitness as well as other factors which bear upon the accuracy of the witness's identification of the defendant, including but not limited to any of the following: [¶] The opportunity of the witness to observe the alleged criminal act and the perpetrator of the act; [¶] The stress, if any, to which the witness was subjected at the time of the observation; [¶] The witness's ability following the observation to provide a description of the perpetrator of the act; [¶] The extent to which the defendant either fits or does not fit the description of the perpetrator previously given by the witness; [¶] The cross-racial or ethnic

39

error was a violation of his constitutional right to due process as it deprived him of meaningful opportunity to present a complete defense.

In our previous opinion we held that defendant had forfeited this issue by failing to object or request a modification of the instruction in the trial court. (See *People v. Sánchez* (2016) 63 Cal.4th 411, 461 (*Sánchez*); *People v. Sullivan* (2007) 151 Cal.App.4th 524, 561.) We also rejected defendant's contention that the certainty factor was erroneous, noting that we were bound by the California Supreme Court cases that have specifically approved the factor, such as *Sánchez, supra*, at pages 461-462, *People v. Johnson* (1992) 3 Cal.4th 1183, 1231-1232 (*Johnson*), and *People v. Wright* (1988) 45 Cal.3d 1126, 1144 (*Wright*).

We granted defendant's petition for rehearing following the recent publication of *People v. Lemcke* (2021) 11 Cal.5th 644 (*Lemcke*). The Supreme Court had granted review in that case to

---

nature of the identification;  [¶]  The witness's capacity to make an identification;  [¶]  Evidence relating to the witness's ability to identify other alleged perpetrators of the criminal act;  [¶]  Whether the witness was able to identify the alleged perpetrator in a photographic or physical line-up;  [¶] The period of time between the alleged criminal act and the witness's identification;  [¶]  Whether the witness had prior contacts with the alleged perpetrator;  [¶]  The extent to which the witness is either certain or uncertain of the identification;  [¶] Whether the witness's identification is in fact the product of his or her own recollection, and any other evidence relating to the witness's ability to make an identification."

40

consider whether "instructing a jury with CALCRIM No. 315, which directs the jury to consider an eyewitness's level of certainty when evaluating an identification, violate[s] a defendant's federal and state due process rights." (*Id*. at pp. 653-654.) The court concluded that it did not, under the circumstances of that case. (*Id*. at p. 654.)[13]

Defendant acknowledges that he did not object to the instruction, nor did he ask for a modification or clarifying instruction. Defendant argues that his failure to object should be excused as futile because "the California Supreme Court's holding regarding the witness certainty factor in *Lemcke* represents a dramatic and unforeseen change in the law"; and because the trial court would have been bound by prior decisions of the California Supreme Court upholding the certainty factor, such as *Sánchez, supra*, 63 Cal.4th at pages 461-462, *Johnson, supra,* 3 Cal.4th at pages 1231-1232, and *Wright, supra*, 45 Cal.3d at page 1144. Defendant's argument appears to be that the dramatic and unforeseen change in the law was to overturn *Sánchez*, *Johnson*, and *Wright*. If so, we disagree. The California Supreme Court did not overturn *Sánchez, Johnson* or *Wright* and did not disapprove the eyewitness certainty factor in CALCRIM No. 315 or CALJIC No. 2.92.

---

[13] In *Lemcke*, the court found no material difference between the wording in CALCRIM No. 315 and the wording of the certainty factor in CALJIC No. 2.92, explaining that "[i]n effect, the instructions set forth two ways of saying the same thing: that jurors should consider the witness's level of certainty when assessing the credibility and accuracy of the identification testimony." (*Lemcke, supra*, 11 Cal.5th at p. 656, fn. 6.)

41

Contrary to defendant's claim that the *Lemcke* court "disapproved of the inclusion of the witness certainty factor in a standard jury instruction on eyewitness identification," the court held that under the circumstances presented there the codefendant (Rudd) failed to establish error or a denial of due process. (See *Lemcke, supra*, 11 Cal.5th at p. 669.) The court noted the "general agreement [among researchers and the courts of several other jurisdictions] that witness certainty is not a good indicator of accuracy under most circumstances" and acknowledged that "the current version of the instruction might confuse jurors about the relationship between confidence and accuracy." (*Id.* at p. 666.) The court therefore exercised its supervisory powers by directing "trial courts to omit the certainty factor from CALCRIM No. 315 until the Judicial Council has the opportunity to consider how the language might be better worded to minimize juror confusion on this point." (*Id.* at p. 669.) The court clarified that "[t]rial courts, however, retain discretion to include the factor when the defendant requests that it do so." (*Ibid.*)[14]

---

[14] Not only was there no dramatic change in the law, but the *Lemcke* decision was also not unforeseen. The California Supreme Court granted review of the appellate court decision on October 10, 2018, for the express purpose of examining the propriety of the certainty factor. The case had thus been pending for a year during defendant's second trial. (See *People v. Lemcke* (Oct. 10, 2018, S250108).) Moreover in his 2016 concurring opinion in *Sánchez, supra*, 63 Cal.4th at pages 494-498 (conc. opn. of Liu, J.), Justice Liu urged the court to reevaluate the certainty factor, making many of the same observations the court has made in *Lemcke, supra*, 11 Cal.5th at pages 665-669.

42

We reject defendant's contention that the failure to object should be excused because the trial court would have been bound by the California Supreme Court's prior decisions upholding the certainty factor, such as *Sánchez, supra*, 63 Cal.4th 411, *Johnson, supra*, 3 Cal.4th 1183, and *Wright, supra*, 45 Cal.3d 1126. Defendant does not explain what the trial court would have been bound to do prior to the publication of *Lemcke*. In fact there is no indication in the record that the trial court would have refused a correct, nonargumentative alternative instruction or modification. Nor is there anything in *Sánchez, Johnson*, or *Wright* that would have precluded the trial court from granting such a request. Indeed, the *Wright* court held that the trial court had erred in refusing the defendant's proposed alternative instruction on eyewitness identification, but found the error harmless. (*Wright, supra*, at p. 1144.) "If defendant had wanted the court to modify the instruction, he should have requested it. The trial court has no sua sponte duty to do so." (*Sánchez, supra*, at p. 461.)

The record shows a likelihood that defense counsel *intentionally* did not object or request a modification. In *Sánchez*, our high court recognized that in some cases the defense "would surely want the jury to consider how *uncertain* some of the identifications were, as CALJIC No. 2.92 instructs." (*Sánchez, supra*, 63 Cal.4th at p. 462.) In *Lemcke*, the court noted with approval that in *Sánchez* it rejected a claim challenging CALJIC No. 2.92's certainty language based in part on its observation "that the instruction was at least partially beneficial to the defendant because some of the trial witnesses had expressed uncertainty in their identification" and on the observation that the *Sánchez* court concluded "'[a]ny reexamination of our

43

previous holdings in light of developments in other jurisdictions should await a case involving only certain identifications.'" (*Lemcke, supra*, 11 Cal.5th at pp. 656-657.) Here, in closing argument, counsel enumerated the CALJIC No. 2.92 factors, including the certainty factor. She then reviewed at length the evidence showing just how *uncertain* were the identifications made by Love and Miralda. She pointed out that although Love identified defendant's photograph in a photographic lineup, she also identified a different person in the same lineup as possibly the front passenger. Counsel argued "that's called a tentative ID. She's not saying 100 percent that's the person. This is not a positive identification, I submit to you. This is a tentative ID." Counsel also spoke at length about Miralda and Love's conflicting descriptions of the front passenger's clothing, pointing out that Miralda selected defendant in a photographic lineup after the shooting, but failed to identify him in a live lineup. Instead he chose two others whom he said "looked like" the passenger but was not sure.

Defendant was thus not prevented from presenting his defense; and as in *Lemcke*, defendant has "failed to establish that the trial court's decision to include the certainty factor . . . violated his due process rights or otherwise constituted error." (*Lemcke, supra*, 11 Cal.5th at p. 669.) Also as in *Lemcke*, defendant was able to call an eyewitness identification expert to present evidence of the identification procedures used and to cross-examine the eyewitnesses.[15] (See *Lemcke*, at p. 647.) In

---

[15] Defendant complains that Rudd's expert in *Lemcke* gave more detailed testimony than his own expert regarding the limits of certainty in suggesting accuracy and that no other eyewitness

44

addition the trial court instructed the jury regarding the prosecution's burden to prove defendant's guilt beyond a reasonable doubt (CALJIC No. 2.90) and to prove beyond a reasonable doubt that defendant was the person who committed the crime (CALJIC No. 2.91). The trial court also instructed the jury that failure of recollection was common and that innocent misrecollection was not uncommon (CALJIC No. 2.21.1). Contrary to defendant's claim otherwise, these instructions were essentially the same as those given in *Lemcke*, which instructed "that the prosecution retained the burden to prove Rudd's identity as the perpetrator beyond a reasonable doubt, and that witnesses sometimes make honest mistakes." (*Lemcke*, at p. 647.)

Although we find no error, we also conclude that in view of the instructions given and compelling evidence of defendant's guilt (as discussed in part I above), "[i]t is not reasonably probable defendant would have obtained a more favorable result had the trial court deleted the certainty factor." (*Sánchez, supra*, 63 Cal.4th at p. 463, citing *People v. Ward, supra*, 36 Cal.4th at p. 214.) Thus, if the trial court had erred, we would find it harmless.

### B.  *Aider and abettor instructions*

Defendant contends that the court erred in failing to instruct the jury that a conviction of first degree murder or attempted murder requires a finding beyond a reasonable doubt that defendant personally deliberated and premeditated an

---

identification expert was called. However, defendant does not claim that he was prevented from asking Dr. Pezdek to testify more fully or from calling a different expert. There is also no such indication in the record.

intent to kill.  In particular, he contends that the aiding and abetting instructions given to the jury, CALJIC Nos. 3.00, 3.01, and 8.80.1, were erroneous.

Defendant claims that although he did not object to the instructions or request clarification or amplification, he has not forfeited the issue, because the trial court was obligated to give only instructions that were correct statements of law (see *People v. Hudson* (2006) 38 Cal.4th 1002, 1012) and that defendant's substantial rights were affected by the erroneous instruction (singular).  (See § 1259.)  Defendant also claims that no objection was necessary because the court must instruct on all elements required for conviction.  (See *People v. Rubalcava* (2000) 23 Cal.4th 322, 333-334.)  Defendant then argues that the instructions (plural) were erroneous because they did not offer guidance on the proper determination of whether an aider and abettor deliberated and premeditated his intent to kill. Defendant indicates that just one of the three cited instructions affected his substantial rights but fails to specify which instruction.

Defendant's assignment of error is not clear.  The People construe defendant's argument as claiming that CALJIC No. 3.00 is the allegedly erroneous instruction.  Defendant does not counter the People's construction in his reply brief.  We agree with the People.

Defendant complains that the instruction invited the jury to find him guilty of whatever crime the jury determined the shooter had committed, based upon his presence that facilitated the crime or crimes, without regard to defendant's own intent or whether he personally deliberated and premeditated that crime. As authority for this argument, defendant cites a 2013

46

depublished case involving CALCRIM former No. 400,[16] *People v. Ramirez* (Sept. 11, 2013, G044703), which (as the People note) was ordered vacated by the California Supreme Court on July 9, 2014 (S214133).[17]  That case held that an earlier version of the instruction was defective for the reason defendant argues here. (See *People v. Ramirez, supra*, G044703.)  However, not only has defendant cited the case in violation of rule 8.1115 of the California Rules of Court, CALJIC No. 3.00 was revised prior to defendant's 2019 trial.  As pointed out by the People, defendant's jury was given the revised version, which makes clear that the aider and abettor's own state of mind determines his guilt.[18]

---

[16]  CALJIC former No. 3.00 is the analogue to CALCRIM former No. 400.  (*People v. Johnson* (2016) 62 Cal.4th 600, 640.)

[17]  *People v. Ramirez, supra*, G044703 was previously published at 219 Cal.App.4th 655.

[18]  The jury was instructed as follows:

"Persons who are involved in committing or attempting to commit a crime are referred to as principals in that crime. *Except as to the crime of murder*, each principal, regardless of the extent or manner of participation, is equally guilty. [¶] Principals include:  One, those who directly and [actively] commit or attempt to commit the act constituting the crime; or  [¶]  Two, those who aid and abet the commission or attempted commission of the crime.  [¶]  When the crime charged is either murder or attempted murder, the aider and abettor's guilt is determined by the combined acts of all the participants, as well as the person's *own mental state*. If the aider and abettor's mental state is more culpable than that of the perpetrator, that person's

47

As revised, the instruction makes clear that "aiders and abettors are not always guilty of the same crime as the actual perpetrators." (*People v. Bryant, Smith and Wheeler, supra*, 60 Cal.4th at pp. 432-433, citing Use Note to CALJIC No. 3.00 (Spring 2010 rev.).)  Defendant does not quote, refer to, or challenge the pertinent language in the current version. Defendant is not relieved of his forfeiture, as he does not demonstrate or argue that the version read to the jury in this case was an incorrect statement of law.  (*People v. Hudson, supra*, 38 Cal.4th at pp. 1011-1012.)  Nor has he claimed that the version read to the jury affected his substantial rights.  Thus, we have no basis to consider the issue pursuant to section 1259.

Regardless, the court did not fail to instruct the jury on how to determine whether an aider and abettor should be found guilty of deliberate and premeditated murder, as defendant asserts.  "'It is fundamental that jurors are presumed to be intelligent and capable of understanding and applying the court's instructions.' [Citation.]  "'A defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant. [Citations.]" [Citation.]  "'[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.""" (*People v. Bryant, Smith and Wheeler, supra*, 60

---

guilt may be greater than that of the actual perpetrator.  Similarly, the aider and abettor's guilt may be less than the perpetrator's if the aider and abettor has a less culpable mental state." (CALJIC No. 3.00, italics added.)

48

Cal.4th at p. 433.) Here, the jury was instructed that in order to find defendant guilty of murder, it must determine his own mental state. Other instructions made clear what mental state must be proven beyond a reasonable doubt. The court informed the jury that defendant was charged with murder and defined express malice as the intent to kill (CALJIC Nos. 8.10 and 8.11). The court defined first degree murder as willful, premeditated, and deliberate, with a lengthy explanation of those terms (CALJIC No. 8.20). The jury was instructed that to find defendant guilty of murder, it must unanimously find defendant guilty of an unlawful killing and must also unanimously agree as to whether he is guilty of first or second degree murder (CALJIC No. 8.74). With regard to attempted murder, the court made clear that to find defendant guilty the jury must find that he intended to kill (CALJIC No. 8.66). With regard to the allegation that attempted murder was willful, deliberate, and premeditated, the jury was instructed with CALJIC No. 8.67.

In sum, the trial court correctly and thoroughly instructed the jury that to find defendant guilty of murder and attempted murder as an aider and abettor, it must unanimously find that defendant harbored his own intent to kill and that first degree murder is deliberate and premeditated murder.

Defendant suggests that, because the instructions omitted or failed to describe an element of the charged offense, in violation of his constitutional right to a jury trial, prejudice from the alleged errors must be analyzed under the *Chapman* test for federal constitutional error to determine whether the error was harmless beyond a reasonable doubt. (See *Chapman, supra*, 386 U.S. at p. 24.) We do not agree with either contention but would find any error harmless under any standard.

49

Defendant argues that the murder could have been a "spur-of-the-moment" shooting and that there was no evidence that defendant ordered Childress to stop the car or ordered Allen to get out and shoot the victims or that defendant and his accomplices were "hunting to kill members of a rival gang."

Defendant's behavior with Love minutes before the shooting provided compelling evidence that defendant and his accomplices were in fact out "hunting to kill" rival gang members, as they were in rival gang territory when defendant commented on Love's wearing a blue bandanna. The gang expert testified that the BPS gang was associated with red, while the enemy Crip gangs used the color blue. Defendant, with a large black revolver in his lap, told Love, "Bitch, I'll kill you. Blood. I'll kill you." The three drove away only when people began to move around nearby. A reasonable inference from this evidence is that Love was not shot because there were witnesses and that, minutes later, more isolated victims were found. We conclude beyond a reasonable doubt that defendant suffered no prejudice from the instructions as given and that the result would have been no different if defendant had requested additional or clarifying instructions.

### C. *Gang limiting instruction*

Defendant contends that the trial court erred by failing to instruct sua sponte that gang evidence standing alone cannot prove a defendant is an aider and abettor.

"[A]lthough a court should give a limiting instruction on request, it has no sua sponte duty to give one." (*People v. Hernandez, supra*, 33 Cal.4th at p. 1051.) Defendant does not claim to have requested such an instruction. The trial court gave the standardized instruction limiting the jury's use of gang

50

evidence.[19]  The trial court is not required to give duplicative instructions.  (*People v. Bolden* (2002) 29 Cal.4th 515, 558.)

Jurors are presumed to have understood and followed the trial court's instructions.  (*People v. Gonzales, supra*, 51 Cal.4th at p. 940.)  We thus presume that the jurors understood they were permitted to consider the gang evidence for *no purpose* other than stated in the instruction and that determining whether defendant was an aider and abettor was not a stated purpose.  We therefore also presume that the jurors did not consider the gang evidence to determine whether defendant was an aider and abettor.

Defendant claims prejudice from the combination of the "erroneous aiding and abetting instruction" and the omission of

---

[19]     As read to the jury, CALJIC No. 17.24.3 stated as follows:

"Evidence has been introduced for the purpose of showing criminal street gang activities, and of criminal acts by gang members, other than the crimes for which the defendant is on trial.  [¶]  This evidence, if believed, may not be considered by you to prove the defendant is a person of bad character or that he has a disposition to commit crimes.  It may be considered by you *only for the limited purpose of determining if it tends to show that the crime or crimes charged were committed for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, or assist in any criminal conduct by gang members*.  [¶]  For the limited purpose for which you may consider this evidence, you must weigh it in the same manner as you do all other evidence in this case.  [¶]  You are not permitted to consider such evidence for any other purpose."  (Italics added.)

the limiting instruction that he did not request. We have rejected defendant's claim that the aiding and abetting instruction was erroneous. We also reject defendant's claim of prejudice.

## VI. The trial court's comment regarding the cost of trial

Defendant claims that the trial court prejudicially erred in telling the jury (without objection) that courtroom operation costs were $30,000 per day and that a mistrial would cost a lot of money. Defendant argues that the comment created pressure on the jury to reach a verdict quickly and that such pressure was prejudicial, because it must have been apparent to the jurors that this trial was defendant's retrial.

Defendant has taken the court's comment out of context. As a part of the admonishments made at the end of the day that the jury was selected and sworn, the court told the jury not to speak to anyone about the case, not to do research, and not to form an opinion on any issue until after discussions with other jurors during deliberations. The court elaborated on those admonishments and also told the jurors not to be late each day of trial and after each recess. The trial court then said to the jurors:

> "So why are we so careful on this case? Why can't you talk to your cousin, the lawyer, or your next-door neighbor, a police officer? The truth is you cannot go to a dictionary. If you do not understand a word, you have to ask me. You heard me say it many times, that your verdict must be based solely and only on the evidence that comes through the witness stand, and the law that I give you, and nothing else. That means you cannot go to Wikipedia, you cannot Google anything about this case. You cannot disseminate any information to all your Facebook friends, because it's a violation. How much a violation? Costs $30,000 a day to run this courtroom. That's $30,000 a day of your money, taxpayer money. If a juror does any

52

kind of stupid misconduct, like doing outside research, disseminate information and because of that I have to declare a mistrial, that's $30,000 a day that goes right down the drain, and we can't afford it."

The trial court concluded:

"You can write a book when this case is done.  But until then, please follow my directions explicitly.  When you leave, the bailiff in this court is going to give you a phone number for this court.  If you're going to be late, call me because then we have to tell the other jurors that you're going to be late so they can get angry at you.  [¶]  Anyway, have a good evening.  See you tomorrow morning, 9:00 sharp.  [¶]  Any questions you have, you can ask the bailiff."

Relying on *People v. Barraza* (1979) 23 Cal.3d 675, 682-683 (*Barraza*), and *People v. Gainer* (1977) 19 Cal.3d 835, 852 and footnote 16 (*Gainer*), defendant suggests that the trial court's comment was the equivalent of an "*Allen* charge."[20]  In the footnote in *Gainer* cited by defendant, the California Supreme Court offered the following dictum:  "A third common feature of *Allen*-type instructions is a reference to the expense and inconvenience of a retrial.  While such language was absent from the charge in this case, it is equally irrelevant to the issue of defendant's guilt or innocence, and hence similarly impermissible." (*Gainer, supra*, at p. 852, fn. 16.)  In later decisions, the court has held that not all references to the costs of trial are improper.  (*People v. Andrews* (1989) 49 Cal.3d 200, 220;

---

[20]    See generally, *Gainer, supra*, 19 Cal.3d at pages 843-844 for an explanation and history of the *Allen* charge.

accord, *People v. Bryant, Smith and Wheeler, supra*, 60 Cal.4th at pp. 424-425.)

Moreover, neither *Gainer* nor *Barraza* supports defendant's characterization of the trial court's remarks in this case. The *Allen* charge in *Gainer* was flawed because it was given to a deadlocked jury, impermissibly admonished the minority jurors to consider whatever the majority view was, and included the remark that "'the case must at some time be decided,' with its attendant implication that a mistrial will inevitably result in a retrial . . . ." (*Gainer, supra*, 19 Cal.3d at pp. 851-852.) In *Barraza*, the challenged remarks were also made to a deadlocked jury. (*Barraza, supra*, 23 Cal.3d at p. 685.) The court stated in relevant part: "'[T]he case is an important one, and its presentation to you has involved expense to both sides. If you fail to agree upon a verdict, the case will have to be tried before another jury selected in the same manner and from the same source as you were chosen.'" (*Id*. at p. 681.)

Here, the jury was never deadlocked, the comment came at the very beginning of the trial, the comment did not suggest to the jurors that they should consider the cost in their deliberations, and the comment was merely part of the trial court's effort to stress the importance of obeying the court's admonitions. Under such circumstances, "there is no reasonable probability the statements could have improperly affected the jury's deliberations." (*People v. Andrews, supra*, 49 Cal.3d at p. 221; accord, *People v. Bryant, Smith and Wheeler, supra*, 60 Cal.4th at pp. 424-425.)

Moreover, with the instructions given just prior to deliberations, the trial court read CALJIC No. 17.40, as follows:

"The People and defendant are entitled to the individual opinion of each juror. [¶] Each of you

54

must consider the evidence for the purpose of reaching a verdict, if you can do so.  Each of you must decide the case for yourself, but should do so only after discussing the evidence and instructions with the other jurors.  [¶]  Do not hesitate to change an opinion if you are convinced it is wrong.  However, do not decide any question in a particular way because the majority of the jurors or any of them favor that decision.  [¶]  Do not decide any issue in this case by the flip of a coin, or [by] any other chance determination."

We conclude that the trial court's reference to costs was not error, but if it had been error, giving CALJIC No. 17.40 rendered any error harmless.  (See *People v. Valdez* (2012) 55 Cal.4th 82, 162-164.)

## VII.  Unanimity instruction

Defendant contends that the trial court committed reversible error by failing to provide a unanimity instruction relating to the criminal threat charge.  He argues that such an instruction was required, because the prosecution presented evidence of several threats directed at Love, some made by defendant, others made by Allen and Childress.

A unanimity instruction is typically given where several acts could have been charged as separate offenses.  (*People v. Maury* (2003) 30 Cal.4th 342, 422.)  A criminal threat is the communication of an intent to inflict death or great bodily injury on another with the intent to cause the listener to believe death or great bodily injury will be inflicted on the person or a member of the person's immediate family.  (*People v. Toledo* (2001) 26 Cal.4th 221, 227-228, 233.)

Here, contrary to defendant's suggestion otherwise, the prosecutor did make an election.  The prosecutor discussed the

55

criminal threats almost at the outset of her opening argument in summation.  She pointed out that defendant, while holding a gun in his lap where Love could see it, mentioned the blue bandanna Love wore and said, "Do you know where you're at?  Bitch, I'll kill you."  The prosecutor told the jury about defendant's order to the backseat passenger to get out, and that at some point the driver said, "Bullets ain't got no names . . . ."

"As a general rule, when violation of a criminal statute is charged and the evidence establishes several acts, any one of which could constitute the crime charged, either the state must select the particular act upon which it relied for the allegation of the information, or the jury must be instructed that it must agree unanimously upon which act to base a verdict of guilty.  [Citation.]  There are, however, several exceptions to this rule.  For example, no unanimity instruction is required if the case falls within the continuous-course-of-conduct exception, which arises 'when the acts are so closely connected in time as to form part of one transaction' [citation] . . . [citation].  There also is no need for a unanimity instruction if the defendant offers the same defense or defenses to the various acts constituting the charged crime."  (*People v. Jennings* (2010) 50 Cal.4th 616, 679.)

Relying on *People v. Salvato* (1991) 234 Cal.App.3d 872, 883, defendant argues that the exception for a continuous course of conduct is inapplicable to criminal threats prohibited by section 422.  However, defendant does not argue that the same-defense exception does not apply.  Defendant's one and only defense to the criminal threat charge and all the other crimes charged here was that he was misidentified and was not with Allen and Childress when they and a third person committed the crimes.  There was thus no need for a unanimity instruction.

(*People v. Jennings, supra*, 50 Cal.4th at p. 679.)  This is so because if the jury believed that defendant was not present at the crime scene and played no role whatsoever in any of the threats, the result would have been an acquittal of all charges, and the absence of a unanimity instruction could not result in the finding of guilt as to one threat but not another.  (See *People v. Williams* (2013) 56 Cal.4th 630, 682.)  Under such a circumstance a unanimity instruction is unnecessary.  (*Ibid*.)

## VIII. Cumulative prejudice

Defendant contends that reversal of all convictions is required due to the cumulative prejudice from the claimed evidentiary and instructional errors discussed above.

Because "[w]e have either rejected on the merits defendant's claims of error or have found any assumed errors to be nonprejudicial," we must reject defendant's claim of cumulative prejudicial effect.  (*People v. Sapp* (2003) 31 Cal.4th 240, 316.)

## IX. Firearm enhancement attached to criminal threats charge

Defendant contends that the amendment of the information to add a firearm enhancement allegation with regard to count 5 (criminal threat) must be presumed to have been done for retaliation for having pursued a successful reversal of the prior conviction and thus amounted to vindictive prosecution.

On the first day of the retrial, prior to jury selection, the trial court observed that a gun use allegation had been added to count 5 (criminal threat) in the amended information that deleted the codefendants, filed approximately six months earlier.  After the court asked counsel to discuss the addition, the prosecution moved to amend the information to add the allegation pursuant

section 12022.5, subdivision (a).  The prosecutor explained to the court that the information upon which the first trial proceeded did not allege this enhancement.  The defense objected to the late timing of the amendment given the fact that this was a retrial.  The trial court granted the motion after noting that in the first trial the jury found defendant guilty of the criminal threat charge and there was evidence that defendant used a firearm.

Both the state and federal guarantee to due process prohibits increased charges motivated by prosecutorial vindictiveness.  (*In re Bower* (1985) 38 Cal.3d 865, 873, 876.)  "The constitutional protection against prosecutorial vindictiveness is based on the fundamental notion that it 'would be patently unconstitutional' to 'chill the assertion of constitutional rights by penalizing those who choose to exercise them.'"  (*Id.* at p. 873, quoting *United States v. Jackson* (1968) 390 U.S. 570, 581.)  "[A]n inference of vindictive prosecution is raised if, upon retrial after a successful appeal, the prosecution increases the charges so that the defendant faces a sentence potentially more severe than the sentence he or she faced at the first trial."  (*People v. Ledesma* (2006) 39 Cal.4th 641, 731 (*Ledesma*).)  Such an inference also arises under such circumstances upon retrial after a successful petition for habeas corpus.  (See *In re Bower, supra*, at p. 876.)

However, to preserve this issue for appeal, a defendant must object to the additional charge on this ground or bring a pretrial motion to dismiss it.  (*People v. Edwards* (1991) 54 Cal.3d 787, 827.)  Here, defendant did not object to the amendment on the ground of vindictive prosecution, but on "late timing," nor did

he move to dismiss the allegation.[21]  He has thus forfeited the issue.

Moreover, the contention is without merit.  Relying on *Ledesma, supra*, 39 Cal.4th at page 731, defendant contends that a *presumption* of vindictive prosecution that arose due to the addition of the firearm enhancement caused defendant to face a sentence potentially more severe than he faced at the first trial.  However, it is an *inference*, not a presumption, which arises from such a potential.  (See *ibid*.)  The two terms are not synonymous.  (See Evid. Code, § 600.)  In any event, no such inference or presumption arose here, because the added enhancement did not increase defendant's *maximum* potential sentence.  (*Short v. Superior Court* (2019) 42 Cal.App.5th 905, 914.)

Section 12022.5, subdivision (a) adds an enhancement of three, four, or 10 years to the determinate term.  On retrial, as after the first trial, count 5, criminal threat, was the only charge that carried a determinate term.  Without the enhancement in the first trial, the trial court sentenced defendant on count 5 to a term of seven years, consisting of the middle term of two years plus five years for the gang enhancement.[22]  The amendment did not affect defendant's maximum potential sentence of LWOP for the murder, plus 25 years to life for the firearm enhancement alleged under section 12022.53, subdivisions (d) and (e)(1), plus two consecutive life terms for the attempted murders, plus 25

---

[21]  As the amended information was filed six months prior to the hearing and contained the added enhancement, defendant was not foreclosed by timing from bringing a motion to dismiss the enhancement.

[22]  With the enhancement, defendant's total determinate sentence was 11 years, including four years for the enhancement.

59

years to life for the firearm enhancement alleged under section 12022.53, subdivisions (d) and (e)(1), for a total of LWOP, two life terms, and 50 years to life.

Furthermore, as defendant acknowledges, there can be no presumption of vindictive prosecution if it had been impossible to proceed on the more serious charge in the original trial. (See *United States v. Goodwin* (1982) 457 U.S. 368, 376, fn. 8; *Blackledge v. Perry* (1974) 417 U.S. 21, 29, fn. 7.) Defendant suggests that it was the prosecutor who caused the impossibility here by dismissing the firearm enhancement originally alleged prior to the retrial. Defendant does so by stating that "the prosecutor apparently believed that justice had been served by the dismissal of the firearm use allegation in connection with the criminal threats count until [defendant] prevailed on appeal. Without more, the only inference from this fact is that the prosecutions [*sic*] changed its mind because [defendant] prevailed on appeal." As the People explain, however, defendant was held to answer in the original proceedings after a preliminary hearing on the criminal threats charge as well as the firearm enhancement, but the court then granted a *defense* motion to dismiss the enhancement allegation prior to trial. In reply, defendant concedes the People's point. Thus, the prosecutor was not able to proceed on the enhancement in the second trial, and no inference or presumption of vindictive prosecution arose.

As the People also point out, defendant received the same maximum sentence after the retrial as he received in the first trial; and the People aptly compare it to the observation in *Ledesma* that "'[a]bsent proof of invidious or vindictive prosecution, as a general matter a defendant who has been duly convicted of a capital crime under a constitutional death penalty

60

statute may not be heard to complain on appeal of the prosecutor's exercise of discretion in charging him with special circumstances and seeking the death penalty.'" (*Ledesma, supra*, 39 Cal.4th at p. 730.) As defendant did not raise an issue in the trial court or here regarding the lawfulness of his eventual sentence, we apply that comparison and conclude that defendant cannot be heard to complain of an additional four years added to his minimum sentence.[23]

## X.     Fines and fees

Relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157, 1168, 1172 (*Dueñas*), defendant contends that the imposition of statutory assessments and a fine without first determining that he had the ability to pay them violated his right to due process under the state and federal constitution. Defendant did not object to the imposition of the assessments and fine, does not claim that he requested a determination of his ability to pay, and has not cited to any evidence in the record that he will not be able to make payments from his prison pay. (See generally *People v. Lowery* (2020) 43 Cal.App.5th 1046, 1054-1061.) In general, a failure to object to fines and fees in the trial court, based on an inability to pay, forfeits the issue on appeal. (See *People v. Aguilar* (2015) 60 Cal.4th 862, 864; *People v. Avila* (2009) 46 Cal.4th 680, 729.) Defendant contends that he did not forfeit the

---

[23]     Section 12022.5, subdivision (c), allows the trial court to strike or dismiss this enhancement in the interest of justice at sentencing or any resentencing that may occur pursuant to any other law. As we vacate defendant's sentence in its entirety (see part XI below), defendant is free to seek dismissal of the enhancement if he is resentenced. (See *People v. Buycks* (2018) 5 Cal.5th 857, 893-894.)

issue, because there is a conflict among the Courts of Appeal, and because it is now before the California Supreme Court, as the due process issue posed by *Dueñas* was unsettled at the time of his sentencing. We agree that the appellate courts have reached conflicting conclusions regarding whether *Dueñas* was correctly decided, and the issue is currently before the California Supreme Court in *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted November 13, 2019, S257844. (See *People v. Petri* (2020) 45 Cal.App.5th 82, 90, and cases cited therein.) However, we do not agree that defendant is therefore relieved from raising a *Dueñas* issue in the trial court. *Dueñas* was published January 8, 2019, 10 months before defendant was sentenced. Its due process analysis was well known by then and defendant thus had ample notice to raise a *Dueñas* issue at sentencing.

Regardless, we have previously disagreed with *Dueñas*'s analysis and have concluded that *Dueñas* was wrongly decided. (*People v. Hicks* (2019) 40 Cal.App.5th 320, 326, 329, review granted Nov. 26, 2019, S258946.) In order to demonstrate a due process violation a defendant must show that the "'imposition of these financial obligations . . . denied defendant access to the courts' [or] '. . . result[ed] in defendant's incarceration.'" (*People v. Petri, supra*, 45 Cal.App.5th at p. 92, quoting *People v. Hicks, supra*, at p. 329; see also *People v. Caceres* (2019) 39 Cal.App.5th 917, 922-923, 928-929.) As defendant has not done so here, his due process claim fails.

## XI.    Gang enhancements under Assembly Bill 333

In supplemental briefs defendant contends, and the People agree, that Assembly Bill 333 requires the reversal of the true findings regarding gang-related enhancements imposed at sentencing. The parties disagree whether the prosecution may

retry the allegations. Defendant asks that we revisit his claim of cumulative prejudice in light of the reversal of the gang enhancements.

The jury found true the gang-related enhancements alleged pursuant to section 186.22, former subdivision (b)(1), section 190.2, subdivision (a)(22) and section 12022.53, subdivision (e)(1).[24] Assembly Bill 333 amended section 186.22. Assembly Bill 333 did not amend section 190.2, subdivision (a)(22) or section 12022.53, subdivision (e)(1), but does affect them, as discussed within.[25]

Section 186.22, former subdivision (b)(1) provided for increased punishment of one "convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (Stats. 2017, ch. 561, § 178.) Section 186.22, former subdivision (f) defined "'criminal street gang'" as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the [enumerated] criminal acts . . . , having a common name or common identifying sign or symbol, and whose members *individually or collectively* engage in, or have engaged in, a pattern of criminal gang activity." (Stats. 2017, ch. 561,

---

[24] We refer collectively to the enhancements provided by section 186.22, former and current subdivision (b)(1), section 190.2, subdivision (a)(22), and section 12022.53, subdivision (e)(1), as the gang-related enhancements.

[25] Assembly Bill 333 also added section 1109, which provides for bifurcation of gang participation and enhancement allegations from the guilt phase of trial.

§ 178, italics added.)  As relevant here, section 186.22, former subdivision (e) defined "pattern of criminal gang activity" as the commission or conviction of one or more of specified enumerated offenses, the last of which was committed within three years after a prior offense.  (Stats. 2017, ch. 561, § 178.)

Section 190.2, subdivision (a)(22) is a special circumstance, which if proved allows for a penalty of death or LWOP for one convicted of first degree murder while actively participating "in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang."

As relevant here section 12022.53, subdivision (e)(1) provides a penalty of 25 years to life in prison for a person convicted of murder who violated section 186.22, subdivision (b), and a principal in the murder personally and intentionally discharged a firearm that proximately caused the victim's death.  (See 12022.53, subds. (d), (e).)

Effective January 1, 2022, Assembly Bill 333 amended section 186.22.  (Stats. 2021, ch. 699, § 3.)  Section 186.22, subdivision (b)(1) now applies to a conviction of "a felony committed for the benefit of, at the direction of, or in association with *a* criminal street gang," instead of "*any* criminal street gang."  Section 186.22, subdivision (f) has redefined "criminal street gang" as "an ongoing, organized association or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in subdivision (e), having a common name or common identifying sign or symbol, and whose members *collectively* engage in, or have engaged in, a pattern of criminal gang activity."  (Italics added.)

A "pattern of criminal gang activity" now means the commission or conviction of two or more enumerated offenses, "provided at least one of these offenses occurred after the effective date of this chapter, and the last of those offenses occurred within three years of the prior offense and within three years of the date the current offense is alleged to have been committed, the offenses were committed on separate occasions or by two or more members, the offenses commonly benefited a criminal street gang, and the common benefit of the offense is more than reputational . . . ." (§ 186.22, subds. (e)(1); see *id*., at subd. (g).)

Assembly Bill 333 also added the following language: "As used in this chapter,[26] to benefit, promote, further, or assist means to provide a common benefit to members of a gang where the common benefit is more than reputational. Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (§ 186.22, subd. (g).)

The People agree that the amended law applies here as defendant's judgment is not yet final on appeal.[27] Although the

---

[26] This provision's reference to "this chapter" means chapter 11 (beginning with section 186.20) of title 7 of part 1 of the Penal Code, the California Street Terrorism Enforcement and Prevention Act.

[27] "[W]hen the Legislature enacts a law ameliorating punishment without including an express savings clause or a similar indicator of its intent to apply the law prospectively only, we infer an intent 'that the new statute imposing the new lighter

amended definition of criminal street gang in section 186.22 does not reduce the penalty imposed by the enhancements, the *Estrada* rule has been applied to statutory amendments that "redefine, to the benefit of defendants, conduct subject to criminal sanctions." (*Tapia v. Superior Court* (1991) 53 Cal.3d 282, 301, citing *People v. Rossi* (1976) 18 Cal.3d 295.) Thus we agree that Assembly Bill 333 applies retroactively to defendant.

The parties agree that the gang evidence here does not support a gang related enhancement under the amended definition of criminal street gang. The gang expert's opinion at trial was that the crimes were committed for the gang's benefit by elevating the participants' status within the gang and by strengthening the power and reputation of the gang through fear. Thus the evidence supporting an intent to benefit was reputational, which is no longer sufficient to prove that defendant committed the crime "for the benefit of, at the direction of, or in association with a criminal street gang." (§ 186.22, subd. (b)(1).) Furthermore, the expert's opinion that the BPS gang was a criminal street gang was based upon two predicate crimes committed individually by a BPS gang member, rather than collectively as is now required by section 186.22, subdivision (f).

Defendant urges that the gang enhancements should be vacated with no retrial. Citing *Monge v. California* (1998) 524

_____

penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply.'" (*People v. Lara* (2019) 6 Cal.5th 1128, 1134, quoting *In re Estrada* (1965) 63 Cal.2d 740, 745.) "The rule in *Estrada* has been applied to statutes governing penalty enhancements, as well as to statutes governing substantive offenses." (*People v. Nasalga* (1996) 12 Cal.4th 784, 792.)

U.S. 721, 729, and *People v. Seel* (2004) 34 Cal.4th 535, 542, defendant relies on the rule that the double jeopardy clause precludes a second trial when a *conviction* is reversed on appeal due to insubstantial evidence. Defendant's reliance is misplaced, as both the United States Supreme Court and the California Supreme Court have made clear in the cited cases that double jeopardy prohibitions in both the federal and state Constitutions do not apply to proceedings in noncapital cases to determine the truth of sentence enhancement allegations. (See *Monge v. California, supra*, at pp. 728-729, 734; *People v. Seel, supra*, at pp. 542, 545.)

"Where . . . evidence is not introduced at trial because the law at that time would have rendered it irrelevant, the remand to prove that element is proper and the reviewing court does not treat the issue as one of sufficiency of the evidence." (*People v. Figueroa* (1993) 20 Cal.App.4th 65, 72.) The prosecution will thus have the opportunity to retry the gang enhancement allegations in compliance with the amended section 186.22. If the prosecution choses to retry the gang allegations, defendant will be entitled to a jury trial on the issue. (See *People v. Figueroa, supra*, at pp. 71-72.) We will reverse and vacate the sentence and remand for that purpose. If the gang-related enhancements are not proven or not retried, they will remain vacated, and the trial court may resentence defendant within the parameters set forth in *People v. Buycks, supra*, 5 Cal.5th 857 without reimposition of the gang-related enhancements.

We decline defendant's request to revisit his claim of cumulative prejudice due to alleged instructional and evidentiary errors in light of the reversal of the gang enhancements, having

67

found forfeiture, no error, or no prejudice in our previous discussions of instructional and evidentiary errors.

## DISPOSITION

The judgment of conviction is affirmed. The sentence is reversed, vacated and remanded. If upon remand the gang-related allegations are not retried or not proven true, the enhancements will remain vacated, and defendant shall be resentenced. If the gang allegations are proven, the original sentence shall be reinstated.

_____

CHAVEZ, J.

We concur:


_____

LUI, P. J.


_____

ASHMANN-GERST, J.